UNITED STATES DISTRICT COURT
DISTRICT OF VIRGINIA



Joe BALTAS,
 PLAINTIFF.

              Civil Action No.
              1:20CV 414 TSE/MSN

V.

Harold W. CLARKE,
In His Individual and Official Capacities;

Rollin Cook,
In His Individual and Official Capacities;

_____ Allen,
In His Individual and Official Capacities;

R. Clem,
In His Individual and Official Capacities;

_____ Little,
In His Individual and Official Capacities;

S. Anderson,
In Her Individual and Official Capacities;

B. Meade,

In His Individual and Officer Capacities ;

A. Mullins,

In His Individual and Officer Capacities ;

Eric Miller,

In His Individual and Officer Capacities ;

Shannon Fuller,

In His Individual and Officer Capacities ;

J. Looney,

In His Individual and Officer Capacities ;

L. Mullins,

In His Individual and Officer Capacities ;

Francis Stanley,

In Her Individual and Officer Capacities ;

James Lambere,

In His Individual and Officer Capacities ;

S. Franklin,

In His Individual and Officer Capacities ;

Jeffrey B. Kiser,

In His Individual and Official Capacities;

Deborah Ball,

In Her Individual and Official Capacities;

S. Jessee,

In Her Individual and Official Capacities;

J. Minigrese,

In His Individual and Official Capacities;

DEFENDANTS.

A JURY TRIAL

IS

HEREBY DEMANDED

AND

A PRELIMINARY INJUNCTION

AND

TEMPORARY RESTRAINING ORDER SOUGHT

-3-

# COMPLAINT

## A.  INTRODUCTION

1. The Plaintiff herein alleges under 42 U.S.C. §§ 1983 and 1988 that the behavior and actions of the Defendants violated his First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments under the United States Constitution.

## B.  PRELIMINARY STATEMENT

2. The Plaintiff herein, Joe Boltes, is a Connecticut ("Conn.") State Prisoner Sentenced to the Custody and Control of the Commissioner of the Conn. Department of Corrections ("Conn. DOC") and is held in the Virginia Department of Corrections ("VA DOC"), who acts as an agent for Conn. DOC, pursuant to an Interstate Compact Contract ("ICC") promulgated under 4 U.S.C. §112 and was at all times relevant to this Complaint housed in Red Onion State Prison, in Pound, Virginia.

3. The Plaintiff alleges that the Defendants acted individually and/or in Concert under Color of law and Color of their authority as DOC officials to violate the Civil Rights of the Plaintiff, the ICC and the Administrative Regulations of Conn. DOC and Conn. Law established to protect the Rights of Prisoners under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

4. The Plaintiff specifically alleges Defendant's acting alone and/or in Concert did:

a. retaliate against him;

b. subject him to unconstitutional conditions of confinement;

c. deny him and interfer with his access to Counsel and Courts;

d. act with deliberate indifference;

e. hinder his access to administrative remedies and threaten and intimidate
   him chilling said access;

f. deprive him of basic human needs;

g. fail to protect him;

h. conspire to assault and/or kill him;

i. subject him to isolation confinement;

j. deprive him of due process;

k. deprive him of equal protections;

l. deprive him of association and communication with friends and family;

m. seize and withheld personal property depriving him of possession and enjoyment
   of said property;

n. fail to supervise resulting in harm;

o. subject him to harassment and sexual harassment in violation of PREA;

p. deny and interfere with medical care;

q. violate protected liberty interests and contractual agreements;

r. subject him to cruel and unusual punishments;

s. through actions and/or failures to act did torture him;

t. maintain unconstitutional customs, practices, policies and
   procedures.

C.    JURISDICTION AND VENUE

5.  The Court has Jurisdiction over the Plaintiff's Claims of clear and egregious violations to his Federal Constitutional Rights under 28 U.S.C. §§ 1331, 1343 (a)(3), 1367 (a) and 1332.

6.  The events giving rise to the Causes of Action described herein occurred in the District of Virginia, and thus Venue is appropriate under 28 U.S.C. § 1391 (b)(2).

7.  The Court has Jurisdiction and Venue over Plaintiff's claims against out of State Defendant Rollin Cook, Pursuant to the Interstate Compact "Long Arm Statute."

8.  The Court has Supplemental Jurisdiction over Plaintiff's claims of clear and egregious violations of State laws under 28 U.S.C. § 1367.

9.  The Court has Jurisdiction over Plaintiff's Claims of Clear and egregious violations to the Interstate Compact Contract under 4 U.S.C. § 112, Article 1. § 10, Cl. 3 of the U.S. Constitution and the Fourteenth Amendment of the U.S. Constitution.

10.  The Plaintiff seeks Damages Pursuant to 42 U.S.C. §§ 1983 and 1988, Declaratory Relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Injunctive Relief pursuant to 28 U.S.C. §§ 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

-6-

## D.   PARTIES

11. The Plaintiff herein, Joe Baltas, Conn. DOC No. 339650 and VA DOC No. 2051693, was at all times relevant to this Complaint a Conn. State Prisoner held in Virginia DOC, who is an agent of Conn. DOC, Pursuant to an Interstate Compact Contract Promulgated under 4 U.S.C. §112 and State and Federal Laws and agreed to by both Party States. At all times relevant to this Complaint he was housed at Red Onion State Prison ("ROSP") in Pound, Virginia.

12. The first named Defendant, Harold W. Clarke, was at all times relevant to this Complaint the Director of the Virginia DOC and was acting as an agent for the Conn. DOC Pursuant to the Interstate Compact. He is sued in his individual and official Capacities.

13. The Second named Defendant, Rollin Cook, was at all times relevant to this Complaint the Commissioner of the Conn. DOC and Conn. Interstate Compact Manager located at Conn. DOC, 24 Wolcott Hill Rd., Wethersfield, CT 06109. He is sued in his individual and official Capacities.

14. The third named Defendant, _____[1] Allen, was at all times relevant to this Complaint a Corrections Officer employed at ROSP. He is sued in his individual and official Capacities.

15. The fourth named Defendant, R. Clem, was at all times relevant to this Complaint

the first names of several Defendants are unknown, when this is the case a ____ is used.

-7-

a Correctional Officer employed at ROSP. He is sued in his individual and official capacities.

16. The fifth named Defendant, ___ Little, was at all times relevant to this Complaint a Correctional Sergeant employed at ROSP. He is sued in his individual and official capacities.

17. The sixth named Defendant, S. Anderson, was at all times relevant to this Complaint a Registered Nurse/Medical Clerk employed at ROSP. She is sued in her individual and official capacities.

18. The seventh named Defendant, B. Meade, was at all times relevant to this Complaint a Correctional Sergeant employed at ROSP. He is sued in his individual and official capacities.

19. The eighth named Defendant, A. Mullins, was at all times relevant to this Complaint a Correctional Officer employed at ROSP. He is sued in his individual and official capacities.

20. The ninth named Defendant, Eric Miller, was at all times relevant to this Complaint a Correctional Unit Manager employed at ROSP. He is sued in his individual and official capacities.

21. The tenth named Defendant, Shannon Fuller, was at all times relevant to this Complaint an Assistant Warden employed at ROSP. He is sued in his individual and official capacities.

22. The eleventh named Defendant, J. Looney, was at all times relevant to this Complaint a Correctional Officer employed at ROSP. He is sued in his individual and official Capacities.

23. The twelfth named Defendant, L. Mullins, was at all times relevant to this Complaint a Correctional Disciplinary Hearing Officer employed at ROSP. He is sued in his individual and Official Capacities.

24. The thirteenth named Defendant, Francis Stacey, was at all times relevant to this Complaint a Correctional Mail Clerk employed at ROSP. She is sued in her individual and official Capacities.

25. The fourteenth named Defendant, James Lambert, was at all times relevant to this Complaint a Correctional Lieutenant employed at ROSP. He is sued in his individual and official Capacities.

26. The fifteenth named Defendant, S. Franklin, was at all times relevant to this Complaint a Correctional Captain employed at ROSP. He is sued in his individual and official Capacities.

27. The Sixteenth named Defendant, Jeffrey B. Kiser, was at all times relevant to this Complaint the Warden of ROSP. He is sued in his individual and Official Capacities.

28. The seventeenth named Defendant, Deborah Ball, was at all times relevant to this Complaint a Nurse Practitioner employed at ROSP. She is

sued in her individual and official capacities.

29. The eighteenth named Defendant, S. Jessee, was at all times relevant to this Complaint a Registered Nurse employed at ROSP. She is sued in her individual and official capacities.

30. The nineteenth named Defendant, J. Milligrest, was at all times relevant to this Complaint a Correctional Officer employed at ROSP. He is sued in his individual and official capacities.

31. All named Defendants, with the exception of Defendant Cook, were employees of the State of Virginia's Department of Corrections acting as agents for Defendant Cook and the Connecticut Department of Corrections. All Defendants acted under Color of Law and Color of their authority as Corrections Officials.

## E.    CAPACITY OF DEFENDANTS

32. All named Defendants are sued in both their individual and official Capacities.

## F.    PREVIOUS LAWSUITS

33. The Plaintiff herein has not brought any other lawsuits in either

State or Federal Court dealing with these facts or circumstances.

## G.     PREVIOUS DISMISSED ACTIONS or APPEALS

34. The Plaintiff has had no Civil Actions or Appeals in either state or Federal Court, which were dismissed as frivolous, Malicous or for failure to State a Claim on which relief could be granted.

## H.     EXHAUSTION of ADMINISTRATIVE REMEDIES

35. Pursuant to the Prison Litigation Reform Act, Codified 42 U.S.C. § 1997e(a), the Plaintiff has exhausted all of his AVAILABLE remedies.

36. The Plaintiff has been denied access to the remedies process, threatened and intimidated effectively Chilling his abilities to pursue remedies, inclusive of acts of violence as will be discussed and claimed herein. He wishes to Proceed with this action.

37. Plaintiff claims exemption to Exhaustion requirement pursuant to 28 U.S.C. §1915(g) as he is in imminent danger of Serious Physical injury.

1. ## STATEMENT of FACTS

38. Prior to Dec. 20, 2019 the Director of the VA DOC, Harold W. Clarke ("Director Clarke") and the Commissioner of the Conn. DOC, Rollin Cook ("Commissioner Cook") entered into a Contractual agreement to transfer the Plaintiff from Conn. to Virginia ("VA") under interstate Compact laws and provisions of the Contract.

39. On Dec. 20, 2019 Plaintiff was involuntarily transferred pursuant to that agreement, from Conn. to VA under an interstate Corrections Compact Contract and State and federal Laws promulgated under 4 U.S.C. § 112.
                        —See Attached Exhibit 1 "Contract"—

40. Pursuant to Section 2- "Governing Law" of the ICC the Plaintiff is governed by the laws and administrative rules and regulations of Conn. in any manner, while housed in VA.

41. Pursuant to both Conn Law (Conn. Gen. Stat. § 18-106$^2$) and VA Law (VA Code § 53.1-216$^3$), the State level laws that govern interstate compacts in Conn and VA, which have identical statutory language, VA Corrections Officials are granted only the authority to act soley as agents of Conn., the Plaintiff remains subject to the Jurisdiction of Conn. at all times and Cannot be denied any legal right he would have if confined in an appropriate institution of Conn.

2   C.G.S. § 18-106 is hereby incorporated into this Complaint by reference.
3   VA Code § 53.1-216 is hereby incorporated into this Complaint by reference.

42. The Plaintiff was expressly told by both Conn. DOC officials and VA DOC officials that he was transferred to VA as a result of his litigation against Conn. DOC and to hinder said litigation.

43. Plaintiff currently has eight pending State and federal Civil Actions in Conn. Courts of which Corrections officials are the Defendents/Respondents, inclusive of Post-Conviction Habeas' all of which require a great deal of litigation. Plaintiff also has one Pending Criminal Matter. He is Pro Se on four of the Civil Matters, Counseled on the other Civil Matters and he is Counseled in the Criminal Matter.

44. Plaintiff was transported directly to ROSP, which is VA's most restrictive and Secure "Super-mex" Prison and is reserved for only VA's most violent and dangerous offenders and is, by its very nature, a segregation facility that all other VA offenders had to "work their way up to" from lower security facilities through numerous acts of violence and/or disciplinary infractions.

45. Plaintiff was placed in this super-max custody without engaging in any conduct of any Kind in VA and was given no notice, no hearing and no ability to appeal placement as required by Conn. Law and Conn. DOC Administrative Regulations that are titled "Administrative Directives"[4] ("Conn. AD"), specifically Conn. AD 9.4.

46. Upon arrival and processing into ROSP, which included an intrusive strip search, urine test, use of restraints and seizure of Plaintiffs clothing (sweats) which he is authorized to possess pursuant to Conn. AD 6.10, Plaintiff completed medical intake

---

4 Conn. Administrative Directives, which are public record, are hereby incorporated into Complaint by reference.

Wherein he weighed approx. 260 plus pounds and informed nursing staff of his medical conditions of asthma and hypertension and his mental illness diagnosis' of Dysthimic (depression), Antisocial and Borderline Personality Disorders. He also asserted clearly that he was Not Suicidal in any manner. He was issued a VA inmate no. 2051693.

47. Despite Plaintiff's assertions he was Not suicidal he was arbitrarily placed in a suicide Prevention cell with "mental health cell" painted on the doors exterior, in the B3 housing unit.

48. The Conditions of the B3 Cells the Plaintiff was forced to endure were inclusive of, but surely not limited to:

    a.) No running water;

    b.) Non-working toilet that can only be flushed by staff, who apparently have a unit "policy" of one flush per shif (2 daiy), forcing the Plaintiff to endure the presence of human waste the vast majority of the day;

    c.) Deprivation of visual stimuli due to a modification to the exterior cell window in the form of an additional oscilated glass which makes it impossible to see out of;

    d.) Deprivation of a Mirror impacting Plaintiff's hygene and mental stability;

    e.) Deprivation of a writing surface, as the only furnishing was a single steel bunk and the toilet/sink combo, this impacted Plaintiff's ability to correspond and litigate;

    f.) Deprivation of ability to communicate as the cell doors are modified with an addition of a rubber flap that seals the door;

g.) Deprivation of an appropriate ventilation system as the cell "intake" vent feeds directly to the cell "exhaust" vent recycling used stale air between four cells that are interconnected, the sealed cell door further confounds this issue;

h.) Imposition of an interior cell light that remains on 24 hours a day everyday, controlled by staff, causing the Plaintiff severe headaches, eye pain, eye damage, nausea, dizziness, disorientation and a complete deprivation of sleep, a basic human need;

i.) Complete Isolation.

49. The conditions of the B3 housing unit, by policy, are inclusive of :

a.) one hour of recreation outside in a cage five days a week;

b.) a shower on Tue, Fri and Sat, wherein a single razor is provided for the duration of the inmates stay in B3;

c.) shaving in the shower, where their is no mirror causing the Plaintiff to cut himself repeatedly while attempting to maintain hygiene;

d.) a single "community" nail clipper to be used in the shower which is tied to a stcole rope on the shower door and left to sit in the puddle of used shower water;

e.) a scheduled cell cleaning day which staff completely ignore;

d) the eating of all meals in the cells, this is confounded by the filth of the cells, and excrement left in the toilet by staff during meal times, Plaintiff endured this daily.

50. Plaintiff later discovered many of these horrific and harsh conditions are facility wide.

51. On Dec. 21, 2019 Plaintiff began requesting cleaning supplies, rec, showers, access to a phone and so on, staff denied him on all requests and told him to address his issues on Monday.

52. Plaintiff was provided meals in his cell, the meals served were unpalatable and the Portion size was not up to the requirements of an adult male, When Plaintiff protested the food he was simply told "welcome to Red Onion".

53. Plaintiff was subsequently denied a beverage because he had no personal "rubber cup" and the kitchen does not send cups to units, at ROSP the only way to be provided the beverage of your meal is to purchase a rubber flex cup from commissary.

54. On Monday, Dec. 23, 2019 Correctional Officers ___ Allen ("C/o Allen") and R. Crem ("C/o Crem") were posted as the B3 officers and Sergeant ___ Little (Sgt. Little) was posted as the floor supervisor.

55. Plaintiff requested rec, a shower and change of clothes from C/o Allen and C/o Crem who refused him stating "you don't get none of that back here",

56. Plaintiff spoke with Sgt. Little again requesting rec, a shower and a change of clothes, he also requested use of a phone and reported the denials of C/os Crem and Allen. Sgt. Little also denied him and told him "if my officers don't want to give you nothing you ain't gettin it from me."

-16-

57. Subsequently, Plaintiff was taken before a major for a classification hearing he had been provided no notice of, and was told he would have to remain in B3 until after the holidays due to administrators being on vacation.

58. Plaintiff requested a shower and access to a phone to call his attorney and family and was granted his request, he also requested his legal documents.

59. C/O's Clem and Allen were irate that they had to take Plaintiff to the shower, in retaliation they denied him a meal and told him he had a choice between food or a shower and he already chose a shower.

60. Plaintiff then demanded he be provided complaint forms and grievance forms, C/O Clem and Allen refused him and told him "Red Onion doesn't do grievances" they also stated "We know how to deal with inmates like you".

61. Plaintiff spoke with Sgt. Little about the denial of a tray and again requested grievance forms, Sgt. Little also denied him any grievance forms and stated "We don't like that grievance shit here, you should keep that in mind."

62. Plaintiff was subsequently provided a shower, where he was provided a razor and forced to shave with no mirror, he cut himself several times. His legal documents were placed in his cell while he was in the shower.

63. On Dec. 25, 2019 Plaintiff wrote to Commissioner Coork and the Interstate Office regarding his Conditions in VA, his property and requesting copies of the ICC.

64. On Dec. 26, 2019 at breakfast Plaintiff began a hunger strike seeking redress of his grievances which included his housing Conditions, the effects the cell light was having on him, denial of access to the Phone, denial of boots and Cleaning Supplies, and staff's refusal to provide him access to the grievance Process.

65. A Lt. G. Adams responded and informed Plaintiff he would not address his issues but would provide him an emergency grievance.

66. Plaintiff filed the emergency grievance which Adams receipted and filed.
      — See Attached Exhibit 2 "Emergency Grievance" —

67. Subsequently, Registered Nurse S. Anderson ("RN Anderson") and S. Jessee ("RN Jessee") were notified of Plaintiff's hunger strike, their response was they would take no action, nor monitor him until he was at least five days in because he "Just wanted attention."

68. Within hours RN Jessee denied Plaintiff's grievance, despite the fact it was not a medical grievance but a custody grievance. He again began requesting grievance forms and was denied.

69. On Dec. 27, 2019 Plaintiff again sought outside recreation from C/o's Allen and Clem who refused him, and stated he would not come out of the cell until he ate.

70. Subsequently a Sergeant B. Meade ("Sgt. Meade") approached Plaintiff's cell where Plaintiff attempted to request rec and grievances.

71. Sgt. Meade stated to Plaintiff he had "heard all about" him and "if [Plaintiff] came to Virginia with his writing everything up and filing lawsuits we will get you out the way."

72. Plaintiff inquired what he met by "get him out the way" to which Sgt. Meade clarified "it means dead, son, dead!" Meade then emphasized his threat by stating they had had other troublesome inmates "moved out the way about 15 years ago" and gotten away with it, he also stated "we always get away with it."

73. Plaintiff felt extreme fear, as he is personally aware of VA DOC's reputation for using inmate violence against inmates, he requested no more grievances and ceased his pursuit of administrative remedies.

74. On Dec. 28, 2019 Plaintiff requested medical attention, as he felt feint and had chest pains, Sgt. Meade responded and stated he would recieve no medical aid and if he did not eat at dinner Meade would ensure Plaintiff was placed in the worse/most violent unit at Resp.

75. Plaintiff ate dinner and ceased his hunger strike, he had missed eight meals.

76. On Dec. 29, 2019 Plaintiff wrote to his Comm Attorney's reporting the threat and Conditions and seeking aid to be removed from VA.

77. On or about Dec. 30, 2019 Correctional Officer A. Mullins ("C/o Mullins"), while escorting Plaintiff either to or from recreation, while Plaintiff was on his knees for restraints to his ankles, did make sexually harassing statements to him stating that since he was already on his knees he should provide him with oral sex, C/o Mullins was propositioning Plaintiff for a sexual act, which he attempted to ignore.

78. At approx. 10:30am that day the B-Building Unit Manager Eric Miller ("Um Miller"), Assistant Warden Shannon Fuller ("A/w Fuller") and other administrators toured the unit and stopped to speak to the Plaintiff.

79. The Plaintiff generally informed Um Miller and A/w Fuller of the various denials and deprivations and incidents he had endured at ROSP to which A/w Fuller stated "This is how Red Onion runs".

80. Plaintiff also reported the threat by Sgt. Meade and other staff conduct. Um Miller told the Plaintiff to "heed" Meade and to "Not write anything up and respect staff and you'll be okay here."

81. The Plaintiff understood this to be an instruction not to seek administrative remedies or there would be retaliation that these top administrators would sanction.

82. When Plaintiff complained about being kept in a "mental health" cell A/w Fuller and U.M Miller stated this is their "intake process to teach inmates their place at Red Onion."

83. On Dec. 31, 2019 RN Anderson offered Plaintiff a Tuberculosis skin tag test, "PPD", which consists of the intrusive penetration of the skin with a needle, which he refused.

84. Plaintiff understands Policies and Regulations require he should have been placed on a quarantine status due to the risk he posed of infectious disease and that VA Doc should have then sought his return to Conn. as he was not supposed to be transported without an up to date PPD test on file.

85. While housed in B3 C/O's Allen and Clem and Sgt.'s Little and Meade denied him recreation approx. 9 days; Showers 10 days with more than 72 hours between showers; denied him cleaning supplies; denied him access to the Phone all but once; denied him access to administrative remedies; and forced him to live with waste in his cell daily; and denied him water daily. Plaintiff endured these conditions and treatment amongst others for approx. 16 days.

86. On Jan. 3, 2020 despite the risk of infectious disease to the general population ("genpop") U.M Miller moved Plaintiff to genpop. to the B6 housing unit into B601 cell, this move was conducted during a facility lock down and search.

87. Upon arrival the BC unit was undergoing search, wherein staff searched every inch of the unit and cells extensively throughout the day. No weapons were found, the unit remained locked down.

88. The Conditions of the BC unit and ROSP in general are inclusive of, but not limited to:

   a.) Interior Cell Lights that remain on for 24 hours every day;

   b.) Modified exterior cell window that has an addition of oscillated glass that is impossible to see out of, depriving Plaintiff of outside visual stimuli, a basic human need;

   c.) Approx. 4 hours of daily out of cell recreation;

   d.) All meals eaten in cells within mere feet of a toilet;

   e.) A "Community" Nail Clipper tied to a metal rope on the wall that is never cleaned;

   f.) Outside recreation approx. twice a week for one hour;

   g.) Gym recreation approx. twice a week for one hour;

   h.) access to phones daily;

   i.) access to kiosk and emails daily;

   j.) TV in housing unit;

   k.) access to Religious Services weekly;

   l.) extreme restrictions on movement;

   m.) in event of an incident use of force on the entire unit by way of a mace grenade discharged at all inmates, including those not involved.

   n.) access to Commissary weekly with a $50.00 spending limit.

o.) access to visits;

P.) Possession of Property, inclusive of personal TV's.

89. Plaintiff's cell was furnished with a desk, mirror, sink, toilet, bunk, running water and two large lights in the interior, where all other cells had only one light, and the cell was filthy.

90. Plaintiff requested cleaning supplies from both Sgt. Little and Correctional Officer J. Looney ("C/o Looney"), who stated "you aint gettin nothing."

91. On Jan. 6, 2020 Plaintiff was classified according to ROSP/VA DOC Policies and procedures. At this time Plaintiff UM Miller that he was supposed to be managed according to the laws and regulations of Conn. DOC. Miller stated "That's not how we do things down here."

92. Subsequently, Plaintiff refused to sign VA DOC Mail Policy authorization to seize, copy and destroy his personal U.S. Mail. Plaintiff noted on the form that VA "Operating Procedures" ("OP") do not apply to him and that he is entitled to recieve his original mail in accordance with Conn. Laws (C.G.S. §§ 4-8, 18-81, 52-570d) and Conn. AD 10.7, as Conn. does Not authorize seizure, Photo copying or destruction of Correspondence.

— See Attached Exhibit 3 "Mail Policy form" —

Plaintiff does assert mandatory language does deny VA DOC any discretion to apply "OP"s

−23−

93. The VA DOC OP X631 imposes an allowance of Doc officials to seize U.S. mail, Photocopy it, then destroy the originals, it also imposes a limit on the amount of pages that can be recieved. The copies provided are black and white on plain paper and often cut out portions of the original tampering with the integrity of the document, including Photos, Cards, etc.

94. In Contrast, Conn. AD and Laws that govern Plaintiff's mail allows for an unlimited amount of mail and never authorizes seizing or photocopying any mail/Property unless it is identified as contraband.

95. The evening of Jan. 6, 2020 Plaintiff wrote to Commissioner Cook regarding the threats, incidents and Conditions being imposed and requested, amongst other things, his removal from VA. Plaintiff carbon copied this Correspondence to Director Clarke, and the Governors of Conn. and VA.

— See Attached Exhibit # "letter" —

96. On Dec. 7, 2020 Plaintiff was again offered a PPD skin test which he refused and explained he would consent to the alternative X-ray test, but would not consent to the intrusive needle test as it violates his Personal religious belief's. At No time was Plaintiff notified this would result in the issuance of a disciplinary infraction.

97. Subsequently, RN Anderson charged him with a disciplinary offense of "refusing to participate in preventive/prophylactic therapies."

-24-

98. On Jan. 8, 2020 the lockdown ended and the unit went back to normal operations allowing inmates out togeather.

99. On Jan. 11, 2020 a secondary search was conducted in the BC unit targeting approx. 7 cells for weapons, which produced shanks from a minimum of 3 of those cells. Sgt. Meade was one of the supervisors conducting these searches.

100. During this time frame Corrections staff did solicit multiple inmates to attack Plaintiff with a weapon in exchange for favors and/or goods/drugs.

101. Sgt. Meade did provide a weapon to an inmate and did solicit him to attack Plaintiff and did falsely tell the inmate the Plaintiff was a "rat" and in VA on a protective custody status for "ratting" to further incite violence against Plaintiff.

102. Following the discovery of multiple weapons only days after a major search, the Administration failed and/or refused to conduct another search of the unit to secure safety.

103. On Jan. 13, 2020 a fight occured wherein an inmate used a weapon to stab another inmate, during this incident officers wantonly fired mace cannisters into the unit subjecting Plaintiff and all other uninvolved prisoners to mace, causing Plaintiff to undergo a severe asthma attack.

-25-

104. Following this stabbing UM Miller prohibited staff from conducting another search and AW Fuller and the Warden failed to order a search continuing to allow weapons in the unit to go unfound.

105. On Jan. 14, 2020 Plaintiff spoke with UM Miller regarding the management of him in accordance with the 1CC, specifically he addressed his need for access to unrecorded legal calls, his mail, property, and food as Conn. Law passed by Governor Malloy mandated the portions, perecebility, variety and costs.

106. Plaintiff explained to UM Miller the ROSP menu was providing food that was approx. 2/3 the minimum required portions for adult males as dictated by OSHA and the American Corrections Association, that the food was unpalatable, often boiled worse then dog food, that their was no variety as the meals were all essentially the same rotation of beans as protein, etc, etc.
— See Attached Exhibit 5 "VA ROSP MENU" —

107. Plaintiff explained his own states menu, which operated on the absolute minimum nutritional requirements was far superior, and at a minimum, he was entitled by the governors laws (Conn.) to a greater portion size, as VA's menu was causing him to starve.
— See Attached Exhibit 6 "Conn. Doc Menu" —

-26-

108. Um Miller responded that there would be no "special diet" for the Plaintiff, to which he explained that the VA DOC food was not nutritionally adequate for anyone, not just him.

109. Plaintiff also requested access to the law library and access to the facility typewriter or typing services until such time as his property arrived at ROSP, as Conn. Law and Court Rules require documents to be typed.

110. Um Miller stated "No inmate goes to the Law Library and No inmate gets anything typed", he also asked Plaintiff sarcastically if he thought he would "have[his] own secretary, too."

111. As Plaintiff walked away Um Miller added, unsolicited, that he "might have helped you if you hadn't have cried to the Director," clearly referencing Plaintiff's correspondence.

112. That evening Plaintiff wrote inmate requests to A/W Jones and Warden Jeffrey B. Kiser ("Warden Kiser") regarding his management under the ICC according to his states laws and regulations, the deprivations in the ROSP food and Conn. AD 10.18 and Conn. Laws which guarantee him a right to more food and better, and his need of access to a typewriter for access to Conn. Courts. He also complained of ROSP's refusal to Provide an unrecorded Phone for him to speak with his Attorneys in accordance with Conn AD 10.7.

113. On Jan. 15, 2020 Plaintiff attended a disciplinary hearing befor Disciplinary Hearing Officer L. Mullins ("DHO Mullins") regarding the charge from RN Anderson who was present.

114. The Plaintiff explained he has never taken a PPD test and does take the alternative x-ray test and has always done so, as Conn. Law directs he has an absolute right to refuse any medical treatment free from adverse action as it is protected conduct.

115. RN Anderson stated VA DOC doesn't do x-rays unless it is to confirm **or** ~~deny~~ a positive skin tag test, and that disciplinary action is sought under such a refusal because of the unacceptable risk an untested inmate poses to the gen. pop.

116. Apparently it is ROSP's position that they will force inmates through disciplinary action to undergo intrusive testing with needles, rather than use the more efficient and non-intrusive, but more costly, X-ray test. But even when an inmate is untested and poses a threat, they will still thrust him into gen. pop. and use a threat to justify disciplinary action, for Constitutionally protected Conduct.

117. Plaintiff also explained to DHO Mullins that pursuant to the ICC and VA Law he is governed by Conn. AD, cannot be disciplined in a way Conn. prohibits, is entitled to the legal rights of Conn., and that his hearing process is governed by Conn. AD and law and he was being denied the process due him as a Conn. Prisoner.

118. Plaintiff had Paper Copies of the ICC and VA statute which he attempt to provide to DHO Mullins who refused to review the documents, stated he would apply VA Law and VA OP and found Plaintiff guilty penalizing him 60 days good time.

119. Plaintiff appealed this finding and Warden Kiser overturned th finding and dismissed the Charge accepting all of Plaintiff's Interstate arguements. A copy of the Appeal and Dismissal was provided to DHO Mullins.

120. On or about Jan. 17, 2020 Plaintiff recieved notice from Mail Officer Francis Stancey ("Stancey") who informed him all of his incoming social mail and Publications would be disposed of until such time as he signs the inmate authorization form."

121. Plaintiff responded stating pursuant to ICC and Law the mail op does not apply to him and her interference with his mail was unlawful, he had no objection to opening and searching his mail but the blanket mail op of copying and limiting mail and destroying originals Violated his Const AD and Laws and rights. He Provided Copies of the ICC and VA Law to Stancey who disregarded it.

125. On Jan. 18, 2020 while sitting at a table in the BC unit alone approx. three unnamed inmates attacked him from behind with the weapon Sgt. Meade had provided to the third inmate.

-29-

126. During the Melee Plaintiff was stabbed with an 8 inch ice pick like weapon in the back approx. 8-12 times and at least once in the left hand causing a significant laceration.

127. During the Melee Plaintiff was shot by Corrections in the head using a rubber round causing injury and several times in the body, this was due to VA DOC and ROSP policy that allows Corrections to fire wantonly and blindly. The attackers were not shot.

128. During the Melee two Prisoners, Charles Bradley and Jon Copper, came to Plaintiff's aid ceasing their assault, but for their actions Plaintiff would likely have been killed.

129. Corrections arrived in the unit, forced Plaintiff who was visibly bleeding and injured to lay down in the shower area, posing serious health risks to his open wounds, then placed him in restraints and forced him to walk to medical.

130. While in Medical it was determined he needed to be treated at an outside hospital.

131. Plaintiff was forced to endure being placed in fun restraints, inclusive of shackles, cuffs with a steel box, tether chain connecting the two, a belly chain and a taser belt which overlapped his injuries. All of the restraints were applied too tightly causing Plaintiff severe pain.

132. Plaintiff was then transported by Ambulance to Norton Community Hospital.

-30-

133. While in the ER being assessed and treated A/W Fuller arrived, and questioned Plaintiff who informed him Corrections set up the assault, and detailed the facts, as he did not know the attackers and had never interacted with any but one. Fuller stated "We wouldn't do something like that," though he was smirking.

134. Plaintiff informed A/W Fuller the restraints were applied to tightly and were causing him severe pain, cutting into his flesh, and causing him to be unable to move or breath appropriately. Fuller stated it was "too bad" and that the restraints would remain on as applied, he subsequently ordered officers not to loosen the restraints.

135. At some point an investigator arrived and Plaintiff informed him of the ROSP staffs actions.

136. Plaintiff was subsequently treated by a Doctor who requested the restraints be removed as they interferred with his ability to assess and treat the Plaintiff, inclusive of wounds under the taser belt.

137. A/W Fuller stated that the restraints would all remain on at all times unless Plaintiff was to go in for surgery, as that was DOC policy.

138. The Doctor stated the restraints might make him "miss something" he cast treat now causing a need for surgery later. A/W Fuller simply shrugged his shoulders.

139. Plaintiff again asserted VA DOC policy did not apply to him and he should be, at most, cuffed to the medical bed.

140. Plaintiff's clothes were all cut off to allow for assessment and treatment.

141. As Nw furr would not allow restraints removed Plaintiff was forced to remain nude for the duration of his hospital stay.

142. Due to internal bleeding Plaintiff was admitted over night.

143. At apprex. 11:00pm a Captain S. franklin ("Capt franklin") entered Plaintiff's hospital room.

144. Capt. franklin did accept responsibility for the attack on behalf of VA Doc stating "We set it up and will set up another one", he told Plaintiff to "keep your fucking mouth shut from now on" and that "there is no where in Virginia we cant get you!"

145. These threats made Plaintiff fear extreme fear for his personal safety and life while in VA.

146. On Jan 19, 2020 Plaintiff's hand was stitched shut, he was treated and discharged. He then returned to ROSP.

147. Upon arrival at ROSP Plaintiff was placed in used, old, dirty, soiled clothing and brought to medical.

148. Upon the removal of the restraints, which Plaintiff had been in for over 24 hours, he observed severe swelling, bruising and lacerations to his ankles, wrists, waist and torso, all of which were very painful.

149. Plaintiff was quickly assessed, he weighed 248lb's indicating a weight loss of over 20lb's in the course of a month.

150. Plaintiff was placed in Medical Observation Cell-9 with nothing but an old dirty mattress and soiled linens, he requested clean clothing and linens and a shower and was denied by NP Bell, despite still being covered in blood.

151. On Jan. 20, 2020 Plaintiff was provided a shower but no clean clothing or linens.

152. On Jan. 21, 2020 Plaintiff's hand had become severely infected, swelling and oozing discolored liquid were clearly visible and the pain was significant. His other wounds were also red and inflamed and painful.

153. UM Miller informed Plaintiff he would be placed in RHU pending an investigation.

154. Subsequently, Plaintiff was examined by Nurse Practitioner Deborah Bell ("NP Bell") who acts as a Medical Supervisor at ROSP. Plaintiff reported the infection and inflammation of his wounds and loss of movement in his hand and requested an inhaler for his asthma.

155. NP Bell ordered antibiotics for the infection and x-ray for the hand but no inhaler.

156. During the exam RN Anderson stated of Plaintiff "We should have let him die!"

-33-

157.  NP Ball completed a medical exam and, at RN Anderson's insistance, requested Plaintiff take a PPD test, to which he refused in writing noteing that he would consent to the alternative X-ray test, which Ball and Anderson refused to provide.

158.  On Jan. 22, 2020 RN Anderson came to Plaintiff and informed him if he did not take the PPD he would remain on an RHu status with nothing indefinitely and would be issued another disciplinary charge. Plaintiff was forced to endure the intrusive penetration of a needle into his flesh under the threat of adverse action against him by Anderson. He noteted on the PPD form that he was "under Duress".

159.  Plaintiff was subsequently placed in a Restrictive Housing unit ("RHu"), B4 unit in 40C cell.

160.  The Conditions of Confinement imposed in the B4 RHu/Isolation unit are inclusive of, but surely not limited to:
     a.) Complete Isolation Confinement;
     b.) Confinement to Cell approx. 22 hours - 24 hours daily;
     c.) Deprivation of Human Contact;
     d.) Deprivation of ability to socalize;
     e.) Deprivation of access to schooling;
     f.) Deprivation of acess to Programs;
     g.) Deprivation of ability to exercize;
     h.) Deprivation of Visual Stimui due to modified exterior cell window that is impossible to see out of;

i.) Outside recreation for a mandated 1 hour 5 days a week in a cage approx 6 x 12 ft, that is regularly denied arbitrarily on the whim of staff;

j.) A maximum of 3 showers per week, approx. every 2 days, that are often denied arbitrarily on the whim of staff;

K.) All movement out of the cell in full restraints;

l.) Deprivation of furnishing, cells have no storage space for property and no mirrors depriving ability to maintain hygene and impacting mental and emotional wellbeing;

m.) Deprivation of mirrors in showers where shaving must occur depriving ability to maintain hygene and/or posing a serious risk of injury;

n.) "Community" Nail Clipper attached to the shower door by rope that rests in puddles of used water/waste on the floor which are never cleaned posing serious health risks and often causing and spreading fungal nail infections;

o.) Deprivation of storage containers for property;

P.) Touring schedule where staff are only mandated to view prisoners every 40 minutes posing a very serious danger of enabling self harm or suicides;

q.) Recycled Air Ventilation System depriving prisoners of fresh air and risking the spread of contagions;

r.) Deprivation of warm meals as chow carts are not plugged in and intentionally left to rest for extended periods of time, also raising a risk of bacteria and hygene concerns;

s.) All meals served in cells within feet of a dirty toilet, raising raising serious health risks that are further confounded by the

Ventilation System;

t.) Deprivation of access to Commissary, inclusive of a spending limit of $10.00 of which only hygene or stationary items can be purchased, which is further confounding as it imposes a limit and restriction on purchasable postage and stationary improperly limiting and interferring with a prisoners ability to correspond;

u.) Denial of access to information;

v.) Deprivation of visitation and allowance of only non-contact visits;

w.) Deprivation of Phone access and restrictions of twice weekly at random times;

x.) Deprivation of possession of Personal property;

y.) 24 Hour Cell Lighting which is Torturous in its effects.

161. RHU also has a Medical Policy wherein, if a prisoner accepts recreation or a shower he is denied his medication, this is apparently designed to discurage prisoners from exiting their cells to alleviate staff having to actually do their jobs.

— See Attached Exhibit 7 "Medical Policy" —

162. These conditions in this isolation unit are not experienced by the rest of the ROSP gen. pop. with the exceptions of P 160 (h, s, s, y).

163. These conditions are being employed punitively and to harass and torture and are malicous and sadistically employeed and intended to be so.

164. When the Plaintiff entered the RHU cell (B4C) he immediately noticed a

-36-

multitude of cuts and scratches on the cell door, he immediately notified c/o Looney who stated they were aware and that "all of the doors in here are like that."

165. Plaintiff then requested cleaning supplies and was denied.

166. Subsequently, Lieutenant James Lambert ("Lt. Lambert") who is the designated B-Building Supervisor entered a unit, Plaintiff requested cleaning supplies, clean clothing and clean bed linens and was denied, Lt. Lambert told the Plaintiff to wash his laundry "in the toilet."

167. On or about Jan. 24, 2020 Sgt. Meade toured the B4 unit and came upon Plaintiff's cell where he stated "I hope you done learned your lesson, 'Cause if not we're ready."

168. Plaintiff understood this to be a threat of further attacks if he attempted to report any misconduct or pursue any more grievances.

169. On Jan. 27, 2020 Plaintiff's Conn. Appellate Court filings were returned to him for being handwritten.

170. That evening an inmate set fire to his cell (B40) causing an enormous amount of smoke to fill the unit and cycle into the cells due to the recycling faulty ventilation system.

171. This caused the Plaintiff, and others, severe respiratory problems which

Caused Plaintiff chest pains and asthma attacks.

172. Plaintiff and unit were forced to endure the smoke for a prolonged period of time due to Staff's tour schedule of 40 minutes which also contributed to the enabling of the smoke to spread and go unresponded to and the Plaintiff unable to report his condition.

173. Plaintiff was forced to seal his vents and door and lay on the ground trying to gasp for clean air, he fear'd he would die.

174. Once Plaintiff was able to report his condition to a touring officer Capt. Franklin, who is the 2nd shift Commander, responded and denied Plaintiff medical aid stating "eat shit and die".

175. Luckily a short time later the units "fan" system was activated which cleared out the smoke in approx. an hour and a half. The Plaintiff had endured the smoke and it's effects for over two hours.

176. On or about Jan. 28, 2020 Plaintiff's property arrived at ROSP from Conn.

177. On or about Jan. 29, 2020 Plaintiff's antibiotic order expired yet his hand remained infected, he wrote to medical seeking the antibiotic be continued. RN Jessee recieved and recietped this request.

178. Plaintiff spoke with Warden Kiser, he requested the processing of his property be expedited to provide him access to his personal typewriter due to

his Appellate filings being returned. A/w fuller and C/M Miller interceded and stated they would not allow him to possess a typewriter.

179. Plaintiff argued that even VA DOC OP §V(6) provides for access to typewriters or typing services as well as access to the law library and electronic Law Library.

180. They responded that they "don't do any of that at Red Onion."

181. Plaintiff stated he needed said access to litigate his many pro se matters as the only legal access he was currently provided was a "specific citation" request form, Plaintiff can not "research" using such a system as, if he knew all the specific cases and law he needed he would no need to research to begin with.

182. Defendents did not care for his arguements.

183. Plaintiff also requested access to a none recorded phone to call his attorneys and was denied, he then requested to be able to request specific times to be provided the recorded inmate phone, which is a cordless phone passed cell to cell, to ensure contact and not expend his limited weekly social calls.

184. This request was also denied.

185. On or about Jan 30, 2020 Plaintiff recieved a photocopy of outgoing

-39-

Legal Mail he sent to a federal Court of VA that Stanely had opened and inspected with the intent of investigating it's Contents for any information related to ROSP officials.

– See Attached Exhibit 8 "Opened Legal Mails" –

186. Plaintiff subsequently wrote to this Court in Richmond seeking In forma Pauperis forms, he does not Know if that Correspondence was opened.

187. On Jan. 30, 2020 RN Jessee examined Plaintiff's hand which was red, swollen and oozing discolored fluid. Jessee stated "It's fine" and refused to provide any treatment.

188. On or about Jan. 31, 2020 Plaintiff cut himself significantly attempting to shave in the mirrorless shaver with an old dull razor that had not been changed in over two weeks.

189. Plaintiff spoke to Lt. Lambert who's responsibility it is to ensure razors are exchanged for new, Lambert stated he would not provide new razors and ordered Sgt. Little to only "Swap razors once a month."

190. When Plaintiff showed Lt. Lambert the deep cut on his head Lambert laughed and asked if he wanted "duct tape and toilet paper."

191. On or about Feb. 2, 2020 Plaintiff became violently sick, inclusive of a fever, headaches, weakness, and an extreme and hacking cough that produced discolored flem and mucus and was constant.

192. Plaintiff's sickness quickly spread to all of the other three cells inter-connected on his vent due to the facilities ventilation system.

193. On feb. 3, 2020 Warden Kiser placed Plaintiff on "Step Down 2" or "SD2" status which is supposed to be a status inmates who were placed in RHU for disciplinary actions are raised to for good behavior just prior to being released from RHU.

194. Kiser informed Plaintiff that the investigation had concluded and that Plaintiff's request for all of his Comm. property was "kicked up to Richmond" and was being handled by Director Clarke, as was review of his status in VA.

195. On or about feb. 7, 2020 Plaintiff's property was processed by sgt. Meade, who provided Plaintiff only clothing, cosmetics and radio. The rest of his property was restricted and deemed contraband through application of VA DOC OP 802.2 and in direct violation of the 1CC and Comm. AD.

196. The Property[6] denied the Plaintiff is inclusive of, but not limited to: Typewriter; TV; Nintendo 3DS and games; Hot pot; Tablet; Pillow; clothing; Sneakers; Books; magazines; etc.

197. The Plaintiff immediately wrote to Warden Kiser and requested his property

[6] All of the Plaintiff's property is specifically designed for and approved for retention and use in maximum security prisons.

in accordance with Conn. AD 6.10 and offered to waive certain items in a show of "good faith".

196. Pursuant to the ICC and VA Law the Plaintiff is lawfully entitled to any legal right he would have in an appropriate Institution of Conn. and is entitled to Possess his property in accordance with Conn. Law and Conn. AD 6.10 -Attachment C "Male Property Matrix".[7]

— See Attached Exhibit 9 "Conn. Matrix" —

197. Conn. Law and DOC Regulations afford Prisoner extensive property Rights and interest's entitling all it's prisoner's the same property regardless of security level and only restricting possession if on a segregation Status which is limited to a Maximum of 15 days and then only after due process of a hearing and appeal. (Conn. AD 9.4.)

198. Plaintiff also wrote a Seperate request to Warden Kiser to provide him with his TV in accordance with ROSP Policy pursuant to the Offender Handbook revised June 2019 by Kiser, page 30 which specifically Authorizes TV's for "Detention and Segregation".

— See Attached Exhibit 10 "Handbook" —

---

[7] Conn. gen.pop. Security Levels rank from 1-4, 1 being Community Release, 2 minimum, 3 medium and 4 Maximum Security, which would be the VA equivalent of ROSP gen.pop. Conn does have a Level 5 Status "Administrative Segregation" which would be the equivalent of VA's Level 5 which does not apply to Plaintiff or this Action. Conn. does not restrict property by security level.

199. Plaintiff attempted to use his Radio and discovered he could not recieve any signal due to interferrance from the interior cell light being on, thereby depriving him of the use of his property and access to information.

200. On feb. 10, 2020 Plaintiff recieved a responsive memo from Stanely Stating he would recieve only legal mail until he agreed to **VA DOC OP.**
— See Attached Exhibit 11 "Memo" —

201. On feb 11, 2020 Plaintiff was provided approx. 13 books and magazines from his property, a very small portion of the 4 cubic feet Conn. AD allows for.

202. On or about feb. 12, 2020 Plaintiff recieved Warden Kiser's responses to his Property Request's that Plaintiff would not recieve his Conn. Property while in a "VADOC" facility and would not recieve his TV while in RHU, all through application of the VA Doc OP "Approved Property Matrix."
— See Attached Exhibit 12 "VA Matrix" —

203. It became apparent to Plaintiff he would recieve no relief from VA Doc and began preparing this Action.

204. Plaintiff wrote Warden Kiser, Mr fuller, and UM miller stating Pursuant to Conn. Law and Conn. AD 94 he can only be kept in RHU for a maximum of 15 days which had been far exceeded. He requested

-43-

release from RHU, or to be provided his property as they were using a status they were holding him on to deny him his possessions. He also raised issues related to his management and conditions and indicated he would seek federal Action. [8]

205. Plaintiff also wrote to Director Clarke and Commissioner Cook regarding his conditions, unending placement in isolation, denial of his property and requested his property, release from isolation and he emphatically expressed his terror of VA DOC and pleaded for his return to Conn. or exit from VA as he feared for his life.

206. On Feb. 18, 2020 Plaintiff spoke to Warden Kiser who expressly told him that he would not be released from RHU and would remain as he was "indefinitely" until Kiser was "ordered to release" him.

207. Subsequently Plaintiff wrote for Medical aid as he had remained sick for over two weeks and was now coughing up blood and the hair on his arms and body was becoming dry and brittle and falling out, which concerned him greatly.

208. On Feb. 19, 2020 Plaintiff was escorted to Um Miller's office, Lt. Lambert was also present, the two addressed Plaintiff's correspondence and made both indirect and direct threats and made very clear to Plaintiff if he made any formal complaints he "would not like the results."

---

[8] Plaintiff feared including this but was not sure if VA rules required Notice.

209. While this meeting was occuring c/o Looney and others were searching Plaintiff's cell.

210. Upon Plaintiff's return to his cell he found it in disarray with property thrown about the floor and destroyed, inclusive of personal photos, legal documents and hygenic products. The Plaintiff's draft of this action was also "missing."

211. On Feb. 20, 2020 UM Miller and Lt. Lambert fabricated a disciplinary charge against Plaintiff stating upon a cell search Lambert discovered the "cut marks" in the BG01 cell door that Plaintiff reported on his initial entry of this cell to c/o Looney, Lambert documented Looney falsely co-oberated that the cuts were new.

212. Subsequently Lt. Lambert and UM Miller ordered Plaintiff moved to the strip cell, BG01, which is reserved for disruptive prisoners. The cell was still covered in soot from the fire weeks previously which caused Plaintiff severe difficulty breathing, which he reported.

213. Once moved Plaintiff was seen by RN Jessee for his sickness, she observed him cough up blood and flem and told him "he'd be fine", Plaintiff began to make an issue and was verbally aggressive, Jessee stated all she would do was order him cough syrup, he requested a doctor.

214. The Sergeant who was present was appalled and filed a complaint

of Some kind to A/W fuller who Ordered Medical to Conduct a
Chest X-ray to discover why he was Coughing blood.

215. UM Miller and Lt. Lambert and Capt. Franklin Implemented policy [9]
via memo that the Plaintiff's cell would be searched a minimum
of once per shift and that Plaintiff was not allowed to exit
the cell unless a Supervisor Was present.
          — See Attached Exhibit 13 "Door Sign" —

216. This "Policy" resulted in Plaintiff's cell being "searched" repeatedly every
day despite him never leaving the cell, wherein officers would effectively
destroy his cell forcing him to Clean repeatedly. These searches were
often conducted after 10pm. He also had to be strip searched every single time.

217. This "policy" was designed to harass and torment Plaintiff as officials
Knew the cuts in the door were old and that no cutting tool was
found, clearly evidencing Plaintiff made no cuts.

218. On Feb 21, 2020 Plaintiff attended video Court for a Civil Habeas Action
against Commissioner Cook wherein he attempted to have the action
dismissed based on Plaintiff's out of state housing, a transfer
Cook himself implemented, raising a defense of subject matter
Jurisdiction, evidencing Cook's use of the out of state
transfer to interfer with Plaintiff's litigations.

---

[9] Policy was implemented with no promulgation.

219. Following that hearing Plaintiff was intercepted by CM Miller and Lt. Lambert wherein they dismissed the other escorting staff and proceeded to threaten the Plaintiff saying they would not allow him to file any grievances or lawsuits because "Red Onion is Virginia's baby and we're not gonna let you give Virginia's baby a black eye." The Plaintiff tried to make light of the situation and joked he was "not a baby puncher." Miller and Lambert responded that he could be placed on a transport "where anything can happen."

220. Plaintiff understood these statements that if Plaintiff tried to avail himself of grievances or courts the VADOC would set up an incident of him being transported and something along the lines of "he was attempting to escape" would be used to justify him being shot and killed or beaten.

221. Plaintiff was later taken to Medical where his chest/lungs were x-ray'd. He was informed these tests come back negative for any illness in the lungs and his problem was "probably strep throat." He still recieved no treatment.

222. On Feb 24,2020 CM Miller came to the strip cell and asked Plaintiff "you planning on any write ups?" Plaintiff responded "No", Miller responded "good, then we can get you out of there (B601 cell)."

223. Plaintiff was subsequently moved to B415 cell on RHU status.

224. On Feb. 25,2020 Plaintiff recieved Legal Mail from this federal Court in Richmond that was opened outside his presence by Scenery and others with the intent of investigating for anything related to ROSP. They then falsified records saying it arrived opened.

$\qquad$ — See Exhibit 8 Pg 2 —

225. Plaintiff complained to the delivering Investigative Officer who stated Stanley said the USPS opened the mail. Plaintiff responded that USPS does not regularly engage in such felonies and that Plaintiff recieves heards of incoming legal mail daily yet the only mail that is opened at ROSP out of his presence are those between himself and the federal Courts of Virginia.

226. On Feb. 28, 2020 Plaintiff wrote to NW Fuller regarding his ongoing cough which continued to include blood and the complete refusal by medical, inclusive of RN Justce, Anderson and NP Ball, to provide him any treatment.

227. On Feb 29, 2020 the infection in Plaintiff's hand had spread up his forearm causing inflamation and swelling, discolored orange liquid coming from the wound that still remained open all causing him extreme pain. RN Canterell observed this and became extremely concerned and told him to write medical immediately, he noted to her that medical refused to provide him any treatment to which she stated "for that [his arm] I will make sure you are seen."

228. On March 1, 2020 Plaintiff wrote medical about the infection which RN Justice reciepted.

229. On March 2, 2020 Correctional Officer J. Mulgrese ("C/o Mulgrese") conducted a search of Plaintiff's cell wherein he used vulgar language towards him and destroyed personal property ripping personal pictures while stating his vulgarities. He then threatened Plaintiff stating he was going to "break your ass."

230. On March 4, 2020 Plaintiff was seen by RN Jessee who was forced to refer him to the Doctor for the extreme infection, Plaintiff stated "you've known about this for months" to which she replied "you're lucky this was already documented or I'd let it kill you."

231. On March 5, 2020 Plaintiff attended a Disciplinary Hearing before DHO Mullins, for the offenses fabricated by Lt. Lambert and c/m Miller, Lambert was present.

231. DHO Mullins refused to review any of the evidence requested by Plaintiff which included the laws that govern his hearing, and video that would prove Lt. Lambert had not entered Plaintiff's cell, at reported time to "discover" misconduct.

231. DHO Mullins refused to provide the Plaintiff his process under Corn. law and Corn. AP 5.5, and expressly stated he would not, despite being aware of the previous overturn of his finding based on that issue.

232. Lt. Lambert then gave false information and stated c/o Lowry was a witness, Lowry was present and did not deny the contracts.

233. Plaintiff refuted the charges and DHO Mullins improperly found him guilty using VA DOC OP and process and the "Some evidence" standard.

234. Plaintiff then requested his phone not be taken as he could not recieve mail and had no visitation ability due to his use of sleek screens. DHO Mullins took Plaintiff's phone anyway, for 60 days, stating he had been found guilty of three offenses, he knew this to be false as he was

-49-

notified of the Appeal Plaintiff had prevailed on against him. UM Miller subsequently approved the Phone sanction.

235. Plaintiff was left with No ability to Communicate or to associate with anyone.

236. Plaintiff was denied any ability to Call his Attorneys based on this action.

237. On March 13,2020 Plaintiff was seen by NP Bell for his infection who ordered an anesthetic and antibiotic ointment. Plaintiff expressed concern over the hair falling out of his arms to which she ordered "A and D ointment" and said its just dry skin. Plaintiff's skin was not dry. He weighed 218 lb's.

238. On or about that time Plaintiff's sickness subsided. He had been sick for over 35 days where he coughed constantly inclusive of coughing up blood. He was in a constant state of soreness and pain and could barely speak for weeks.

239. On March 14,2020 Plaintiff was issued a disciplinary charge for writing a Vulgarity on a table about UM Miller. Miller apparently discovered this by watching video of the RHU from home at appr. Noon.

240. Subsequently, Plaintiff's cell was searched by Sgt. Little who destroyed property and threw all of his possessions on the floor, Little stated "Sorry Miller Jail 1 had too."

241. On or about March 19, 2020 Director Clarke and Warden Kiser issued memo's regarding the Corvis-19 pandemic, wherein all visies were canceled indefinitely, inmate's were instructed to bathe and wash hands regularley, and cell phone restrictions were lifted.

242. On or about March 20, 2020 the ROSP inmates who engaged in stabbings on Jan. 13th and those found to be in possession of knifes on Jan. 11th, and so on were placed on the RHU release list and returned to the gen.pop. Plaintiff remained in RHU.

243. On March 21, 2020 C/o Mulgrew told the Plaintiff he intended to "rape his shit here."

245. On March 23, 2020 Plaintiff was placed on SDI status, he subsequently discovered SD statuses are "general population assignments" yet he remained in RHU and was denied all gen.pop. privileges and rights.

246. On or about March 24, 2020 Plaintiff recieved a denial of his phone deposit form where he attempted to place $10.00 into his phone debit account in order to call friends, family and his Attorneys as this is the only way he can call his Counsers. The form was denied as "insufficient funds" despite the fact Plaintiff did have sufficient funds in his account.
    — See Attached Exhibit 14 "Phone Deposit of Account" —

247. When Plaintiff questioned the requisite staff they stated "Miller ordered us not to process your phone request because he's pissed your phone got turned back on."

248. On or about March 28, 2020 the infection in Plaintiff's hand subsided and the wound closed, he had endured the infection and incredible pain for approx. 65 days. He still has

not regained complete mobility and feels the damage is permanent.

249. Plaintiff has remained housed in isolation confinement under extremely harsh conditions and atypical and significant conditions not experienced by the rest of the gen pop. foe has been housed as such for over 69 days, he has never recieved a hearing of any kind regarding his housing or classification.

250. While housed at ROSP Plaintiff has never been provided cleaning supplies. While housed in B4 Defendants Little, Looney, Mullins, Lamberc and Miller have denied him cleaning supplies, forcing him to live in filch, and denied him new clean clothing and linens and have regularly denied him outside recreation and access to showers.

251. While housed in B4 C/O Looney and Mullins have denied him meals approx. 7 times without cause to torment and harass him.

252. While housed in VA Plaintiff can recieve no social visites due to travel distance and no legal visits depriving him of access to counsel.

252. While housed in VA Plaintiff is denied communications and private communications with his counsels, he is forced to make all calls on inmate recorded phones at odd times,

253. While housed in VA Plaintiff has been deprived of adequate nutrition, he has lost approx. 45 lb's in approx. 3½ months. Not only is the VA DOC menu/diet insufficient, providing approx. ⅔ of the nutritional and calorie needs of adult men (2500 calories a day minimum) but Plaintiff is entitled to approx. double what VA serves, further VA often serves rotten products that are inedible.

254. The Defendants have implemented, and/or maintained and/or enforced and/or observed Unconstitutional Policies, Practices, Procedures and/or Customs which they are aware of through Personal implementation, enforcement or daily observations, such as but not limited to: 24 hour cell lighting which serves no legitimate Purpose at all guards have Flash lights; Medical segregation policy; blanket mail policy; blanket use of force policy; use of firearms within institution; in cell feeding; windows; menu/diet; use of RHU/ isolation confinement for indefinite and indeterminate amounts of time; Community nail clippers; and all other policies and practices detailed herein.

255. Pursuant to the ICC and state Laws Commissioner Cook is provided requisite updates regarding all incidents and actions of his agents regarding Plaintiff as well as Plaintiff's own Correspondence to him.

256. The Gen. Pop. of Conn. Prisoners do not suffer the hardships or Condition imposed by VA Doc officers. As they are managed in accordance with Conn. AD and provided Adequate food, Clothing, housing, Safety and are provided all property. further they recieve all Property and are never placed in RHU for more than 15 days Without due process of notice, hearing and Appeal, And so on.

257. Plaintiff has been forced to live in a Constant state of Terror and has not been seen or treated by mental health once.

258. The Plaintiff is a Pro Se Litigant entitled to Liberal Construction and Liberal Interpretation of his filings.

## J. CAUSES OF ACTION

## FIRST CAUSE

1. Paragraphs 1-258 are hereby made 1-258 of this Cause.

259. Defendants Clarke and Cook acting individually and/or in Concert did involuntarily **Transfer** the Plaintiff from Conn. to VA in Retaliation for his Civil Actions and to interfere with his ability to present his issues and claims before the Court, said adverse action did deprive him of access to Courts, access to counsel, access to friends and family and ability to associate and did place him in a more restrictive and dangerous environment and did deprive him of equal treatment and privileges of his similarly situated Conn Prisoners.

260. The actions both individually and/or in Concert did violate Plaintiff's First, Fifth, Sixth, Eighth and Fourteenth[10] Amendment Rights under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

261. Plaintiff Seeks Compensatory and Punitive Damages against Defendents in their Individual Capacities and Permanent Injunctive Relief in their Official Capacities Ordering a termination to Plaintiff's Contracted housing in VA and immediate removal from VA DOC to include Plaintiff's Application for Emergency TRO and Preliminary Injunction.

262. Plaintiff also Seeks Declaratory Relief.

---

*10 All Plaintiff's Fourteenth Amendment Claims within this Complaint encompass the Due Process Clause 9/or Protected Liberty Interest, 9/or the Equal Protection Clause, 9/or the Privileged Immunities Clause and are Claimed as such.

## SECOND CAUSE

1. Paragraphs 1-202 of the First Cause are hereby made 1-202 of this Cause.

203. All named Defendant's through their actions and/or failures to act both individualy and/or in concert did subject the Plaintiff to the extremely harsh conditions of Confinement and atypical and significant conditions of the B3 housing unit described herein and did subject him to Isolation Confinement, Cruel and unusual punishments, deprivation of communications and access to counsel and right to association, and other torturous conditions.

204. Defendents Allen, Clem, Little, Meade, A.Mullins and Justice did through their actions and/or failures to act both individualy and/or in concert subject Plaintiff to torturous and Cruel and Unusual Punishments and deprivations, while in the B3 housing unit.

205. The actions and/or failures to act of the Defendants both individualy and/or in Concert did violate the Plaintiffs' First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment Rights under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

206. The Plaintiff seeks Compensatory and Punitive Damages against Defendants in their Individual Capacities and Injunctive Relief in their Official Capacities ordering the cessation of the Conditions imposed and utilized in B3 ad its systematic problems.

207. Plaintiff also seeks Declaratory Relief.

## THIRD CAUSE

1. Paragraphs 1-267 of the Second Cause are hereby made 1-267 of this Cause.

268. The Defendant's through their actions and/or failures to act both individually and/or in Concert did retaliate against Plaintiff for engaging in protected Conduct, inclusive of threatening him, falsifying reports, denying him rights and privileges, harassing him, torturing him, and orchestrating and/or facilitating and attack against him, and so on.

269. The actions of the Defendants did force the Plaintiff to suffer prolonged terror due to their threats and conduct that made their threats credible, which subjected him to a constant fear of violence that shocks modern sensibilities and served no penological purpose and did make access to Administrative Remedies unavailable to him.

270. The actions and/or failures to act of the Defendants both individually and/or in Concert did subject the Plaintiff to serious physical and emotional injuries and have created a substantial risk of future injury.

271. The actions and/or failures to act of the Defendants both individually and/or in Concert did violate the Plaintiff's First, Eighth and Fourteenth Amendment Rights under the U.S. Constitution and 42 U.S.C. §§§ 1983 and 1988.

272. Plaintiff seeks Compensatory and Punitive Damages against Defendants in their Individual Capacities and Injunctive Relief in their Official Capacities Ordering the Plaintiff removed from VA DOC immediately, this includes his Application for Emergency TRO and Preliminary Injunction.

273. Plaintiff also seeks Declaratory Relief.

# FOURTH CAUSE

1. Paragraphs 1-274 of the Third Cause are hereby made 1-274 of this Cause.

275. Defendants through their actions and/or failures to act both individually and/or in Concert did subject Plaintiff to a vicious and violent attack by inmates in violation of his Eighth Amendment Rights.

276. Defendants Clarke, Cook, Fuller, Miller, at a minimum, were on Notice of the threats made against Defendant of violence and did fail to protect him.

277. Defendants were on Notice that weapons remained in the BC unit and did refuse to conduct a search to secure inmate safety thereby acting with extreme deliberate indifference to the Personal safety of the inmate population and Plaintiff and did fail to Protect Plaintiff through their actions and/or failures to act did facilitate the attack against him.

278. The Actions and/or failures to act of the Defendants both individually and/or in concert did violate Plaintiff's Eighth Amendment Rights under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1984.

279. Plaintiff Seeks Compensatory and Punitive Damages against the Defendants in their Individual Capacities and Injunctive Relief in their Official Capacities to include an Order to Investigate these actions, an Order to implement Policies regarding Searches for weapons, and an Order to Remove Plaintiff from VA immediately in Concert with his Application for Emergency TRO and Preliminary Injunction.

281. Plaintiff also Seeks Declaratory Relief.

## FIFTH CAUSE

1. Paragraphs 1-281 of the Fourth Cause are hereby made 1-287 of this Cause.

288. The Defendants through their actions and/or failures to act both individually and/or in concert were deliberately indifferent to Plaintiff's injuries, illnesses, wellbeing and medical needs and did fail to and/or refused to and/or interferred with Plaintiff being treated.

289. Defendant Fuller did act with deliberate indifference and did actively interfere with his ability to be treated at the Hospital and did act with deliberate indifference later.

290. Defendant's Anderson, Jessee and Ball did act with deliberate indifference to Plaintiff's Medical needs, did refuse to treat him and did subject him to excessive and extreme risks, and undue harm.

291. Defendants actions and/or failures to act both individually and/or in concert did violate the Plaintiff's Eighth and Fourteenth Amendment Rights under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

292. Plaintiff seeks Compensatory and Punitive Damages against Defendants in their Individual Capacities and Injunctive Relief in their Official Capacities Ordering a change to DOC restraint policies when Prisoners are in Hospitals to restrain them to beds or some other less intrusive and interferring fashion.

-58-

293. Plaintiff also Seeks Declaratory Ruling.

## SIXTH CAUSE

1. Paragraphs 1-293 of the Fifth Cause are hereby made 1-293 of this Cause.

294. Defendants Anderson and Ball did force the Plaintiff to undergo the intrusive procedure of a PPD test that breaches flesh, under the threat of adverse action and for no legitimate Penological purpose as their is an alternative and more accurate X-ray test which they refused to provide.[11]

295. The actions and/or failures to act of the named Defendants both individually and/or in concert did violate the Plaintiff's First, Fourth, Eighth and Fourteenth Amendment Rights under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

296. Plaintiff seeks Compensatory and Punitive Damages against Defendants in their Individual Capacities and Injunctive Relief in their Official Capacities Ordering that Prisoners who do Not consent to the PPD skin key test be afforded an opportunity to take the alternative X-ray test.

297. Plaintiff also seeks Declaratory Relief.

## SEVENTH CAUSE

---

[11] Where there is No Legitimate Penological Interest, Courts Presume Malicious and Sadistic intent.